SLIP OP. 07-55

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| TROPICANA PRODUCTS, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| and | : | |
| | : | |
| LOUIS DREYFUS CITRUS, INC., and | : | |
| FISCHER S/A AGROINDUSTRIA, | : | |
| | : | |
| Plaintiff-Intervenors, | : | |
| | : | |
| v. | : | |
| | : | Before: Jane A. Restani, Chief Judge |
| | : | |
| UNITED STATES, | : | Court No. 06-00109 |
| | : | |
| Defendant, | : | **Public Version** |
| | : | |
| and | : | |
| | : | |
| A. DUDA & SONS, INC., CITRUS | : | |
| WORLD, INC., FLORIDA CITRUS MUTUAL, | : | |
| SOUTHERN GARDEN CITRUS | : | |
| PROCESSING CORP., and THE COCA-COLA | : | |
| COMPANY, | : | |
| | : | |
| Defendant-Intervenors. | : | |
| | : | |

OPINION

[The International Trade Commission's affirmative determination of material injury by reason of imports of certain orange juice from Brazil REMANDED.]

Dated: April 12, 2007

Neville Peterson, LLP (John M. Peterson, Catherine C. Chen, and George W. Thompson) for the plaintiff.

Vinson & Elkins, LLP (Christopher A. Dunn and Valerie S. Ellis) for the plaintiff-

intervenor Louis Dreyfus Citrus, Inc.

Kalik Lewin (Robert G. Kalik and Brenna S. Lenchak) for the plaintiff-intervenor Fischer S/A Agroindustria.

Peter D. Keisler, Assistant Attorney General; Jeanne Davidson, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Michael J. Dierberg), for the defendant.

James M. Lyons, General Counsel, U.S. International Trade Commission (David A.J. Goldfine and Andrea C. Casson) for the defendant.

Barnes, Richardson & Colburn (Stephen W. Brophy) for defendant-intervenor A. Duda & Sons, Inc., Citrus World, Inc., Florida Citrus Mutual, and Southern Gardens Citrus Processing Corp.

Crowell & Moring, LLP (Jeffrey L. Snyder and Alexander H. Schaefer) for the defendant-intervenor the Coca-Cola Company.


Restani, Chief Judge: This matter is before the court on Plaintiff Tropicana Products Inc.'s ("Tropicana") motion for judgment on the agency record pursuant to USCIT Rule 56.2. Tropicana seeks review of the final determination of the International Trade Commission ("Commission") in Certain Orange Juice from Brazil, USITC Pub. 3838, Inv. No. 731-TA-1089 (Mar. 2006), List 1, P.R. Doc. 329 ("Final Determination"). Specifically, Tropicana challenges the Commission's determination that the industry in the United States producing conventional and organic frozen concentrated orange juice for further manufacturing ("FCOJM") and conventional and organic not-from-concentrate orange juice ("NFC") (collectively "certain orange juice") is materially injured by reason of imports of certain orange juice from Brazil. Fischer S/A Agroindustria ("Fischer") and Louis Dreyfus Citrus, Inc. ("Dreyfus") join the action as Plaintiff-Intervenors. A. Duda & Sons, Inc., Citrus World, Inc., Florida Citrus Mutual,

Southern Gardens Citrus Processing Corp., and The Coca-Cola Co. join as Defendant-

Intervenors.  The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000).

## BACKGROUND

On December 27, 2004, several domestic producers of certain orange juice[1] filed a

petition with the Commission and the Department of Commerce ("Commerce"), claiming that an

industry in the United States was materially injured, or threatened with material injury, by reason

of imports of certain orange juice from Brazil.   Commerce instituted an antidumping duty

investigation and found that certain orange juice from Brazil was being sold at less then fair

value ("LTFV").  Certain Orange Juice from Brazil, 71 Fed. Reg. 2183 (Dep't Commerce Jan.

13, 2006) (notice of final determination of sales at less than fair value and affirmative final

determination of critical circumstances).  Thereafter, the Commission gave its final

determination to Commerce.

Six commissioners participated in the final determination with three

commissioners making an affirmative determination and three making a negative determination.[2]

Pursuant to 19 U.S.C. § 1677(11) (2000), a tie vote is resolved in favor of an affirmative

determination.  Thus, the court will refer to the affirmative determination as the Commission's

---

[1]The petitioners were Florida Citrus Mutual, A. Duda & Sons, Inc., Citrus World, Inc., Peace River Citrus Products, Inc., and Southern Garden Citrus Processing Corp.  Certain Orange Juice from Brazil–Staff Report, Inv. No. 731-TA-1089 (Jan. 27, 2005), at I-1, List No. 1, P.R. Doc. 329 ("Final Staff Report").

[2]Chairman Stephen Koplan, Commissioner Charlotte R. Lane, and Commissioner Shara L. Aranoff made an affirmative determination while Vice Chairman Deanna Tanner Okun, Commissioner Jennifer A. Hillman, and Commissioner Daniel R. Pearson made a negative determination.

determination.

In determining that the domestic industry was materially injured by subject imports from Brazil, the Commission examined data from crop year ("CY") 2001/02 through CY 2004/05. The Commission found that the volume of the subject imports, both in absolute and relative terms, was significant over the period of investigation ("POI"). The Commission also found that the lower-priced subject imports prevented increases in prices for the domestic like product, which otherwise would have occurred to a significant degree. Although the spread of citrus diseases and the large number of hurricanes in 2004 and 2005 in Florida caused a substantial decline in the domestic production of round oranges, the Commission concluded that these factors did not negate the "causal nexus" between the subject imports and the poor financial performance of the domestic industry, because the total volume of subject imports exceeded the shortfall in domestic production. Tropicana appeals the determination on several grounds.

## STANDARD OF REVIEW

The court will uphold the Commission's final determination in an antidumping duty investigation unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

To determine whether a domestic industry is materially injured by reason of a subject import, the Commission must find: (1) a "'present material injury or a threat thereof,'" and (2) causation of such harm by reason of subject imports. Hynix Semiconductor, Inc. v. United States, 431 F. Supp. 2d 1302, 1306 (CIT 2006) (quoting Chr. Bjelland Seafoods A/S v.

United States, 19 CIT 35, 37 (1995)).  In so doing, the Commission "shall consider [three

factors] – (I) the volume of imports of the subject merchandise, (II) the effect of imports of that

merchandise on prices . . . for domestic like products, and (III) the impact of imports of such

merchandise on domestic producers of domestic like products, but only in the context of

production operations in the United States."  19 U.S.C. § 1677(7)(B)(i)(I)-(III).  Additionally, the

Commission "may consider such other economic factors as are relevant to the determination

. . . ."  19 U.S.C. § 1677(7)(B)(ii).

Plaintiff and Plaintiff-Intervenors argue that the Commission's determination is

not based on substantial evidence for several reasons.  They first argue that data upon which the

Commission relied to make its determination are not representative of the entire domestic

industry.  They then argue that the Commission failed to examine properly several other factors

that undermine the determination that the domestic industry was materially injured by reason of

the subject imports.  The court first describes the relevant Commission findings and then

addresses the parties' arguments regarding the sufficiency of the Commission's data from the

domestic industry and the Commission's affirmative determination.

I.      **Findings by the Commission**

        A.      **Definition of the Domestic Industry**

                "Domestic industry" consists of "the producers as a whole of a domestic like

product, or those producers whose collective output of a domestic like product constitutes a

major proportion of the total domestic production of the product."  19 U.S.C. § 1677(4)(A).  In

cases involving agricultural products, such as that at issue, the Commission may include growers

of a raw agricultural input within the domestic industry producing the processed agricultural

product if:

> (I) the processed agricultural product is produced from the raw agricultural product
> through a single continuous line of production; and
> (II) there is a substantial coincidence of economic interest between the . . . growers
> . . . and the processors of the processed agricultural product based upon the relevant
> economic factors.

19 U.S.C. § 1677(4)(E)(i).  The Commission found both factors of § 1677(4)(E) present in this

case and thus defined the domestic industry to include both the domestic processors of certain

orange juice and the domestic growers of round oranges.[3]  Final Determination, at 10–12.

---

[3]As to the first factor of § 1677(4)(E), a processed product is considered to be processed from the raw product in a single, continuous line of production if:

> (I) the raw agricultural product is substantially or completely devoted to the
> production of the processed agricultural product; and
> (II) the processed agricultural product is produced substantially or completely from
> the raw product.

19 U.S.C. § 1677(4)(E)(ii). Here, the Commission found that certain orange juice is produced from round oranges through a single, continuous line of production because the cost of the raw materials for certain orange juice, round oranges, comprised of approximately 80% of the cost of the domestic like product sold during the POI.  Final Determination, at 10.  The Commission also noted that approximately 95% of Florida round oranges are processed into orange juice.  Id.

As to the second factor of § 1677(4)(e), the Commission may consider price, added market value, or other economic interrelationships.  Further,

> (a) if price is taken into account, [the Commission shall] consider the degree of
> correlation between the price of the raw agricultural product and the price of the
> processed agricultural product; and
> (b) if added market value is taken into account, [the Commission shall] consider
> whether the value of the raw agricultural product constitutes a significant percentage
> of the value of the processed agricultural product.

19 U.S.C. § 1677(4)(E)(iii). Here, the Commission found that there is a "substantial coincidence of economic interest between orange growers and domestic producers" of certain orange juice.  Final Determination, at 11.  The Commission found that because the vast majority of domestic fresh oranges were sold through "participation plans," where a grower sells his oranges to an extractor in exchange for a return based on the final amount received by the extractor when the manufactured orange juice is sold, the economic interests of the growers and processors were tied together.  Id.  The Commission also found that because the cost of oranges accounted for 80% of

After defining the domestic industry, the Commission obtained information from both domestic processors of certain orange juice and domestic growers of round oranges to conduct its determination.  The Commission obtained data from twelve out of twenty processors of orange juice in Florida.  The data obtained accounted for more than 90% of the domestic production of certain orange juice in CY 2004/05.  Final Staff Report, at III-1.  In contrast, the Commission obtained responses from a small percentage of 400 selected growers.[4]  Certain Orange Juice from Brazil–Additions & Revisions to the Staff Report, Inv. No. 731-TA-1089 (Feb. 2, 2006), at VI-26, List No. 2, C.R. Doc. 439 ("Additions & Revisions").  Of those responding, half provided usable data.  Id.  Those reporting usable data accounted for approximately 12% of the U.S. production of oranges.  Id.

**B.**      **Conditions of Competition**

Several conditions of competition informed the Commission's "analysis of whether the domestic industry [was] materially injured by reason of subject imports from Brazil."  Final Determination, at 14.  The Commission first examined the supply conditions of the domestic industry, finding that the domestic processors of certain orange juice are almost wholly dependent on domestic growers, mostly in Florida, for their supply of round oranges because

---

the cost of the domestic like product, purchasers of round oranges had an incentive to help growers lower their production costs.  Id. at 12.  In support of this, the Commission noted that cooperatives provided grove care, maintenance, and harvesting services to grower-members.  Id.  Thus, the Commission concluded that the second requirement of § 1677(4)(E) was also met.  Id.

[4]Questionnaires were sent to 400 growers, which were selected through a random sampling of an electronic list of 11,000 grower-members of the Florida Citrus Mutual.  Final Staff Report, at III-1.  [] responded.  Additions & Revisions, Inv. No. 731-TA-1089 (Feb. 2, 2006), at VI-26, List No. 2, C.R. Doc. 439 ("Additions & Revisions").

Case 1:06-cv-00109-JAR    Document 88-2    Filed 04/12/07    Page 8 of 44

Court No. 06-00109                                                                    Page 8

there is no economical way to import oranges.  Id.  The processors thus face year-to-year

fluctuations in the supply of round oranges due to weather conditions and other factors such as

citrus disease.  Id.  For example, during the POI, the Florida orange crop declined from 230

million boxes in CY 2001/02 to 203 million boxes in CY 2002/03, before increasing to 242

million boxes in CY 2003/04, which was the second largest Florida orange crop in history.  Id.

In the aftermath of Hurricanes Charley, Frances, and Jeanne, however, the Florida orange crop

declined to 149.6 million boxes in 2004/05.  Id.  Because of this "inherent volatility in the

domestic supply of round oranges, domestic producers of certain orange juice maintain relatively

large bulk juice inventories."[5]  Id. at 15.

              After the domestic production, the second largest supplier of certain orange juice

to the United States is Brazil.  Id.  Brazil is the world's largest orange juice producer and

exporter, supplying 84% of the global orange juice market.[6]  Id.  Five Brazilian firms, Cargill,

Coinbra-Frutesp, Cutrale, Fischer, and Montecitrus, are covered by the scope of this antidumping

duty investigation.  Id. at 15 n.119.  Another significant Brazilian producer, Citrovita, is not

_____

       [5]During the POI, the size of the domestic inventory of certain orange juice amounted to
approximately one-half of the domestic production in any given year.  Final Determination, at 15.
"The ratio of domestic producers' carryover stocks to U.S. production increased from 48.3
percent in crop year 2001/02 to 56.5 percent in crop year 2002/03 to 57.2 percent in crop year
2003/04 to 58.6 percent in crop year 2004/05."  Id. at 15 n.111.

       [6]Four firms, Coinbra-Frutesp, Cutrale, Fischer/Citrosuco, and Montecitrus, produced the
vast majority, 85%, of the total Brazilian production of subject merchandise in CY 2004/05.
Final Determination, at 15.  "Cutrale is Brazil's largest producer ([] percent) followed by
Fischer/Citrosuco ([] percent)."  Certain Orange Juice from Brazil, Inv. No. 731-TA-1089 (Mar.
2006), at 22 n.116, List 2, C.R. Doc. 559 ("Final Determination (Confidential)").

covered and its imports are considered to be non-subject imports.[7]   Id.

The Commission then examined the demand conditions of the domestic industry,

finding that the domestic consumption of orange juice increased modestly by 3.5 percent during

the POI.  Id. at 16.  Domestic consumption fell from 1.45 billion gallons SSE[8] in CY 2001/02 to

1.43 billion gallons SSE in CY 2002/03.  Id.  It then increased slightly to 1.44 billion gallons

SSE in CY 2003/04 and increased again to 1.50 billion gallons SSE in CY 2004/05.  Id.

Additionally, the Commission addressed the industry practice of blending orange

juice, finding that blending permits producers of orange juice to obtain consistent quality to

satisfy USDA standards, industry standards, customer preferences, and country of origin labeling

requirements.  Id.  Although blending is useful to the domestic industry, the majority of U.S.

purchasers (13/23) stated that the domestic orange juice did not need to be blended with the

subject imports.  Id. at 17.  All responding U.S. purchasers stated that domestic orange juice and

subject imports from Brazil were of comparable USDA grade and viscosity to domestic juice.  Id.

Further, 11 out of 18 responding U.S. purchasers also stated that domestic orange juice and

subject imports from Brazil were always or frequently interchangeable with the domestic juice.

Id.  Thus, the Commission found that the domestic juice did not need to be blended with subject

imports to achieve quality specifications.  Id.

---

[7]Citrovita was previously subject to an antidumping duty order which was effectively revoked on August 5, 2004, pursuant to a negative determination on a second sunset review. Frozen Concentrated Orange Juice from Brazil, 70 Fed. Reg. 19,416 (ITC Apr. 13, 2005) (revocation of antidumping duty order).

[8]Single strength equivalent ("SSE") gallons are a standard volume measurement for ready-to-drink orange juice.  Final Determination, at 17 n.132.

### C.    Volume of Subject Imports

To evaluate the volume of subject imports, the Commission must determine "whether the volume of [subject imports], or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant." 19 U.S.C. § 1677(7)(C)(i). Here, the Commission examined the volume of subject imports and found it to be significant both in absolute terms and relative to domestic production and consumption. Final Determination, at 17.

Specifically, the Commission noted that imports increased by 122.0 million gallons SSE, or 111.2%, from the first year of the POI to the last year of the POI.[9] Id. Subject imports' share of the domestic market rose by 7.9 percentage points overall, increasing from 7.6% in CY 2001/02 to 15.9% in CY 2002/03, then dropping to 10.7% to CY 2003/04 before increasing again to 15.4% in CY 2004/05. Id. at 18–19. Subject imports rose sharply from 154.2 million pounds solids in CY 2003/04 to 231.7 million pounds solids in CY 2004/05, the heavily weather affected period. Id. at 19. Although non-subject imports' share of the domestic market also increased overall by 2.8% during the POI, the Commission noted that the subject imports gained far more market share than non-subject imports. Id. Meanwhile, the domestic producers' share of the domestic market declined overall by 10.7% during the POI.[10] Id.

_____

[9]The volume of subject imports increased from 109.7 million gallons SSE in CY 2001/02 to 227.3 million gallons SSE in CY 2002/03, then decreased to 154.2 million gallons SSE in CY 2003/04 before rising again to 231.7 million gallons SSE in CY 2004/05. Final Determination, at 17 n.133.

[10]Non-subject imports' share of the domestic market fell from 5.2% in CY 2001/02 to 4.2% in CY 2002/03, then increased slightly to 4.5% in CY 2003/04 before increasing to 8.0% in CY 2004/05. Final Determination, at 19 n.137.

The Commission also found that imports of certain orange juice were "necessary to meet domestic demand."  Id. at 17–18.  In fact, during the POI, the increases in the amount of subject imports entering the United States occurred when domestic shipments were at their lowest levels.  Id. at 18.

The Commission rejected three arguments that the volume of subject imports was insignificant.  Id. at 19–21.  As indicated, the Commission first rejected the argument that imports were necessary for blending, finding that the record did not establish that the blending of domestic and imported juice was necessary to meet quality standards.  Id. at 19.  The Commission also rejected respondents' argument that a drawback of the duties paid on the Brazilian imports made it possible for U.S. producers to export certain orange juice.[11]  Id.  The Commission noted that because drawback credits are collected after import duties are paid, drawback credits do not provide any net benefit for exporters.  Id.  The Commission further found that "the fact that the value of drawback credits available significantly exceeds the value of domestic exports demonstrates that there is limited, if any, correlation between domestic exports and the availability of drawback credits."  Id. at 19–20.

Finally, and most significantly, although the Commission found that imports were necessary to meet demand, the Commission rejected the argument that the subject imports here merely remedied the shortfall in the domestic production of round oranges for juice.  Id. at 20.

---

[11]A drawback is "'(1) a repayment in whole or in part of customs duties paid on imported merchandise that is reexported (either in the same form as imported or manufactured into a more finished article) or (2) the refund upon the exportation of an article of a domestic tax to which it has been subjected.'" Novacor Chems., Inc. v. United States, 171 F.3d 1376, 1378 n.1 (Fed. Cir. 1999) (quoting Dictionary of Tariff Information 271 (1924)).

Although subject imports tend to rise in years when Florida production falls and vice-versa,[12] the

Commission found that this was a "simple comparison" that masked the important changes in the

supply/demand balance in the U.S. market over the POI. Id. at 20.  In particular, the Commission

found that "the amount of Brazilian subject imports held in U.S. inventory increased [over the

POI], thereby exceeding the volume of imports necessary to counter domestic production

shortfalls."  Id.  The Commission concluded that because the Brazilian imports' percentage share

of the domestic ending stocks increased from CY 2001/02 to CY 2004/05 (4.9% to 8.7%) and

because the domestic importers' end-of-the-period inventories of subject imports increased from

33.8 million gallons SSE in CY 2001/02 to 51.3 million gallons SSE in CY 2004/05, more

Brazilian subject imports had entered the United States than necessary to remedy a domestic

---

[12]The data are summarized as follows:

| Crop Year | 2001/02 | 2002/03 | 2003/04 | 2004/05 |
|---|---|---|---|---|
| Florida Production of Oranges (million of boxes) | 230 | 203 | 242 | 149.6 |
| Volume of Subject Imports (million of gallons) | 109.7 | 227.3 | 154.2 | 231.7 |

Final Determination, at 14, 17 n. 133.

supply shortage.[13]  Id. at 21.  Thus, the Commission found that the volume of subject imports was

significant, in both absolute terms and relative to domestic production and consumption.  Id.

    **D.     Price Effect of Subject Imports**

          In evaluating the price effects of subject imports, the Commission must consider:

(1) whether "there has been significant price underselling by the imported merchandise" as

compared to the domestic like product; and (2) whether subject imports "otherwise depress[]

prices to a significant degree or prevent[] price increases, which otherwise would have occurred,

to a significant degree."  19 U.S.C. § 1677(7)(C)(ii); see also Taiwan Semiconductor Indus.

Ass'n v. United States, 23 CIT 410, 412, 59 F. Supp. 1324, 1327 (1999) (stating that the

Commission must evaluate "whether price underselling by the subject imports is significant and

whether domestic price depression or suppression caused by the subject imports is significant").

          Here, the Commission found that subject imports of FCOJM undersold the

domestic like product by approximately 8.2%.  Final Determination, at 22.  In contrast, NFC

_____

          [13]The Commission examined the following data in arriving at its conclusion:

| Crop Year | 2001/02 | 2002/03 | 2003/04 | 2004/05 |
|---|---|---|---|---|
| U.S. importers' Brazilian inventory (1,000 gallons SSE) | 33,791 | 41,795 | 26,633 | 51,312 |
| U.S. ending stocks (1,000 SSE) | 692,163 | 704,509 | 842,139 | 590,000 |
| Brazilian import inventory/U.S. ending stocks | 4.9% | 5.9% | 3.2% | 8.7% |

Final Determination, at 21.

subject imports often oversold the domestic like product.  Id.  Nevertheless, the Commission

found that there was significant underselling overall because NFC accounted for less than 10% of

the subject imports by volume during the POI and because the domestically produced FCOJM

represented a substantial volume of domestic sales during the POI.  Id.

       The Commission also found that "subject import prices are suppressing domestic

price increases, which otherwise would have occurred, to a significant degree."  Id. at 23.  The

Commission found that because the unit costs of goods sold ("COGS") for domestic processors

increased only slightly while the domestic industry's ratio of COGS to net sales had been

increasing steadily, "the domestic industry has been unable to recoup its rising production costs

through higher prices on its sales of the domestic like product."[14]  Id.

       The Commission attributed such "cost-price squeeze" to the volume of Brazilian

imports entering the United States at lower than market prices rather than to demand factors.  Id.

at 23–24.  The Commission noted that the domestic industry's cost-price squeeze accelerated in

the last year of the POI when Brazilian imports were at their highest levels and that between

2003 and 2004, this cost-price squeeze resulted in a 7.8% decline in the domestic industry's

operating margin.  Id. at 24.

       The Commission again emphasized that the increase in subject imports in CY

2004/05 "did not simply meet demand and make up for the reduced U.S. supply."  Id.  The

_____

       [14]The domestic industry's COGS in dollars per pound decreased from $0.76 in 2002 to
$0.72 in 2003, then rose to $0.77 in 2004 before rising again to $0.81 in the interim of 2005.
Final Determination, at 23 n.161.  The domestic industry's COGS as a share of net sales
increased from 90% in 2002 to 92.9% in 2003, then rose again to 96.3% in 2004 before falling
slightly to 93.5% in the interim of 2005.  Id. at 23 n.162.

Commission found that the volume of subject imports increased 77.5 million gallons SSE from

154.2 million gallons SSE in CY 2001/02 to 231.7 million gallons SSE in CY 2004/05.  Id.  The

Commission then noted that the "inventories of subject imports increased from 26.6 million

gallons at year end 2003/04 to 51.3 million gallons at year end 2004/05, an increase of 24.7

million gallons."  Id. The Commission found that 32% of this increase went into inventories and

was not "used to meet U.S. demand and replace decreased domestic supplies caused by the 2004

hurricanes."  Id.  The Commission found that this inventory-related increase meant that "subject

imports [were] suppressing prices" because "lower inventories would have created upward

pressure on domestic prices of certain orange juice, allowing domestic processors an opportunity

to more fully recover cost increases."  Id.  Thus, the Commission concluded that "the increasing

volumes of lower-priced subject imports prevented increases in domestic prices for certain

orange juice, which otherwise would have occurred, to a significant degree."  Id. at 24–25.

### E.      Impact of Subject Imports

After the Commission has determined that the volume and price effects of subject

imports are significant, the Commission must assess "the impact of imports of such merchandise

on domestic producers of domestic like products."  19 U.S.C. § 1677(7)(B)(i)(III).  To do so, the

Commission must "evaluate all relevant economic factors which have a bearing on the state of

the [domestic] industry."  19 U.S.C. § 1677(7)(C)(iii).  Relevant factors include, but are not

limited to:

(I) actual and potential decline in output, sales, market share, profits, productivity,
return on investments, and utilization of capacity,
(II) factors affecting domestic prices, [and]

(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment.

Id. § 1677(7)(B)(iii).  The Commission has the discretion "to determine the significance of any particular factor or of the various factors affecting an industry in each particular case."  Hynix, 431 F. Supp. 2d at 1313.

The Commission found that the domestic industry's condition worsened over the POI.  "Domestic producers' market share declined from 87.2 percent in crop year 2001/02 to 79.9 percent in crop year 2002/03, increased to 84.8 percent in crop year 2003/04, and fell to 76.5 percent in crop year 2004/05."  Final Determination, at 25.  While domestic processors' capacity increased by 2.7% overall during the POI, their capacity utilization dropped by 28.3 percentage points between CY 2001/02 and CY 2004/05.[15]  Id. at 25–26.  Domestic production fell 31.3% during the POI.  Id. at 26.  Domestic producers' end-of-year inventories of certain orange juice also fell overall, although the amount of Brazilian subject imports held in U.S. inventories increased.  Id.  The Commission found that relative to production, U.S. shipments, and total shipments, domestic producers' inventories increased between CY 2001/02 and CY 2004/05, and reported inventories of the subject imports increased from 2.3% of total available supply in CY 2001/02 to 3.4% of total available supply in CY 2004/05.[16]  Id.

---

[15]"Domestic industry capacity utilization declined from 85.4 percent in crop year 2001/02 to 74.5 percent in crop year 2002/03, increased to 86.7 percent in crop year 2003/04, and dropped to 57.1 percent in crop year 2004/05."  Final Determination, at 26 n.176.

[16]The number of production workers employed by domestic processors, the hours worked, and the wages paid also declined from CY 2001/02 to CY 2004/05.  Final Determination, at 26 & n.181.

The Commission examined the financial indicators for domestic processors,
finding that there was "an overall decline in their operating performance" for the POI.  Id.  By
volume, net sales for domestic processors declined from 985.0 million pounds solids in 2002 to
975.0 million pounds solids in 2003 to 904.5 million pounds solids in 2004 to 695.5 million
pounds solids in interim 2005.[17]  Id.   By value, net sales for domestic producers declined from
$852.0 million in 2002 to $781.9 million in 2003 to $718.7 million in 2004 to $603.8 million in
interim 2005.  Id. The ratio of operating income to net sales and the profitability, cash flow, and
return on investment for domestic processors also declined during the POI.  Id. at 26–27.

The Commission then examined the condition of the growers, finding that they
experienced declining operating profitability during the POI.  Id. at 27.  Domestic growers'
operating income declined from $12.7 million in 2002 to $3.9 million in 2004.  Id.  Domestic
growers' ratio of operating income to net sales and net sales by value also declined during the
POI.  Id.  The Commission noted that the domestic growers experienced this declining
profitability despite receiving $5.7 million in U.S. government financial assistance in 2003 and
2004.  Id.

The Commission rejected arguments that the injury to the domestic industry was
attributable to reduced domestic demand, domestic supply shortages, U.S. inventory levels, the
"necessity of subject imports for blending and duty drawback, and the growing presence of non-
subject imports."  Id.  Although the Commission recognized that some of the declining trends

---

[17]The financial indicators for processors and growers are expressed on a fiscal year basis.
Final Determination, at 26 n.183.

experienced by the domestic industry were the result of hurricanes and citrus disease, the

Commission concluded

> that the record demonstrates a causal nexus between subject imports and material
> injury to the domestic industry independent of these other factors, based on the extent
> to which the total volume of Brazilian subject merchandise present in the U.S. market
> exceeds any supply shortage and the effect of low prices of such volumes on the
> domestic industry's pricing and financial performance.

Id. at 28.  As to non-subject imports, the Commission found that "while the volume of nonsubject

imports rose over the period examined, they grew at a slower rate and represented a smaller share

of apparent consumption than Brazilian subject imports."  Id. at 27–28.  Thus, the Commission

determined that "the domestic industry producing certain orange juice [was] materially injured by

reason of subject imports of certain orange juice from Brazil that [were] sold in the United States

at less than fair value."  Id. at 28.

**II.     Tropicana's Claims Regarding the Sufficiency of the Data from the Domestic
          Industry**

Tropicana argues that the limited data received from the growers were not

representative of the growers and thus, the Commission should not have relied upon it to evaluate

the condition of the entire industry.  Tropicana argues that because the orange juice industry was

defined to consist of both growers and processors, the Commission must conduct a separate

analysis of each group under 19 U.S.C. § 1677 to determine whether the domestic industry as a

whole was materially injured by reason of the subject imports.

Tropicana's argument is flawed insofar as it asks the court to direct the

Commission to segment the domestic industry into growers and processors and to conduct a

separate analysis for each segment of the industry. "[I]t [is] clear from the language of 19 U.S.C.

§ 1677(4)(A) (1988) that 'Congress intended for the Commission to consider the entire industry' .

. . ."[18]  Comm. for Fair Coke Trade v. ITC, Slip Op. 04-68, 2004 Ct. Int'l Trade LEXIS 87, at *69

(CIT June 10, 2004) (quoting Calabrian Corp. v. United States, 16 CIT 342, 350, 794 F. Supp.

377, 385 (1992)) (footnote omitted).  Indeed, the "language [of § 1677(4)(A)] defies the

suggestion that the [Commission] must make a disaggregated analysis of material injury."

Copperweld Corp. v. United States, 12 CIT 148, 165, 682 F. Supp. 552, 569 (1988).  Rather, "the

[Commission] d[oes] not err in basing its determination on data representing the experience of the

domestic industry as a whole, rather than on the experience of [different segments of the industry]

separately."  Comm. for Fair Coke Trade, 2004 Ct. Int'l Trade LEXIS 87, at *69.

        Although the Commission is not required to make a disaggregated analysis of

material injury and instead can rely upon a set of data that is representative of both the growers

and the processors, here it examined both financial data from processors and from growers to

assess the impact of the subject imports on the domestic industry.  Tropicana challenges this,

arguing that the data is not representative of the entire domestic industry because the information

from the growers is derived from responses of less than half a percent of an estimated 11,000

growers, representing only 12% of the domestic production of round oranges.[19]  Tropicana

essentially argues that under Chung Ling Co. v. United States, the Commission errs "in making

_____

        [18]As previously stated, 19 U.S.C. § 1677(4)(A) defines an industry as "the producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product."

        [19]The Commission's Staff Report also stated that the "extremely small number," i.e. [], of responses from domestic growers "may well not represent a true picture of the operational results of all U.S. growers."  Final Staff Report, at VI-11; Additions & Revisions, at VI-26.

findings and conclusions as to many financial conditions and trends of the 'industry' based merely

on a small and random portion of the initial representative sampling of producers . . . [because]

[s]uch a data base ha[s] no pretense of being representative."  16 CIT 636, 640, 805 F. Supp. 45,

49 (1992).

Here, the Commission responded to criticism regarding the data from the growers,

stating that:

> In accordance with the grower/processor provision, we have included growers in our
> domestic industry definition.  We note, however, that our conclusions regarding the
> significant adverse impact of subject imports on the domestic industry would be the
> same whether growers are included in the domestic industry or not.

Final Determination, at 27 n.193.

It appears that the Commission decided to rely heavily on data from processors

rather than the small amount of data from growers.  In itself, this is not improper, as legislative

history shows that,"[i]n making its injury determination, the [Commission] may give greater

weight to one or the other group within the industry, in proportion to their relative importance, if

either group accounts for a significant portion of the total value of the processed product."  S.

Rep. No. 100-71, 100th Cong., at 111 (1987).  It is not per se unreasonable for the Commission to

weigh the processors' data more heavily than that of the growers, particularly because the

processors were the direct producers of the end domestic like product at issue.  Further, given the

Commission's finding that the economic interests of the growers coincide with those of the

processors, see Final Determination, at 11–12, it is also reasonable to conclude that the

processors' data may partially reflect the condition of the growers.  Thus, despite the minuscule

response rate from the growers, the remainder of the data collected might be sufficient to support

the Commission's determination.

This matter, however, cannot be judged in isolation.  The decision as to which data

to rely on affects other aspects of the determination and given the other problems addressed here,

the fact of the extremely small amount of data from growers may lead to an unsupported

determination.

## III.    The Parties' Claims Regarding the Commission's Affirmative Determination of Material Injury by Reason of Subject Imports

Putting aside the sufficiency of the Commission's data gathering, as previously

discussed, the Commission must evaluate three factors: (1) the volume of subject imports; (2) the

price effects of subject imports on domestic like products; and (3) the impact of subject imports

on the domestic producers of the domestic like products.  19 U.S.C. § 1677(7)(B)(i)(I)-(III).  As

indicated, from its evaluation of these factors,  the Commission must find: (1) a "'present material

injury or a threat thereof,'" and (2) a causal link to the subject imports.  Hynix, 431 F. Supp. 2d at

1306 (citing Chr. Bjelland Seafoods A/S, 19 CIT at 37).  To support a finding of material injury,

the Commission must show that the harm suffered by the domestic industry is "not

inconsequential, immaterial, or unimportant."  19 U.S.C. § 1677(7)(A).  To support a finding of a

causal relationship, the Commission must show a "causal – not merely temporal – connection

between the [subject imports] and the material injury."  Gerald Metals, Inc. v. United States, 132

F.3d 716, 720 (Fed. Cir. 1997).  At issue here is whether the Commission demonstrated the

existence of a causal relationship between the subject imports and the condition of the domestic

industry.

Although the Commission is not required to employ any particular methodology in determining whether the causation element is met, "causation is not shown if the subject imports contributed only 'minimally or tangentially to the material harm.'"  Bratsk Aluminium Smelter v. United States, 444 F.3d 1369, 1373 (Fed. Cir. 2006) (quoting Gerald Metals, 132 F.3d at 722); Nippon Steel Corp. v. United States, 458 F.3d 1345, 1357 (Fed. Cir. 2006) ("This causation requirement is met so long as the effects of dumping are not merely incidental, tangential, or trivial."); Hynix, 431 F. Supp. 2d at 1316 (the Commission "may not satisfy its burden of proof if subject imports contributed only minimally to the injury").  Subject imports, however, "need not be the sole or principal cause of injury . . . [so] long as [their] effects are not merely incidental, tangential or trivial."  Nippon Steel Corp. v. ITC, 345 F.3d 1379, 1381 (Fed. Cir. 2003).

In making its determination, "'[t]he Commission need not isolate the injury caused by other factors from injury caused by unfair imports. . . . Rather, the Commission must examine other factors to ensure that it is not attributing injury from other sources to the subject imports.'" Taiwan Semiconductor Indus. Ass'n v. ITC, 266 F.3d 1339, 1345 (Fed. Cir. 2001) (quoting H.R. Doc. No. 103-316, Vol. 1, at 852 (1994)).  In so doing, the Commission cannot "simply not[e] a potential factor and issu[e] a conclusory assertion that such a factor did or did not play a major role in causing a material injury." Hynix, 431 F. Supp. 2d at 1320.  Instead, the Commission must "analyze compelling arguments that purport to demonstrate the comparatively marginal role of subject imports in causing that injury." Id. at 1317; Taiwan Semiconductors, 266 F.3d at 1345 ("[T]o properly make a material injury determination, the Commission must analyze contradictory evidence or evidence from which conflicting inferences could be drawn, to ensure that the subject

imports are causing the injury, not simply contributing to the injury in a tangential or minimal

way." (citations & quotation marks omitted)).

Here, the Plaintiff and Plaintiff-Intervenors argue that the Commission's

affirmative determination of material injury by reason of subject imports is not supported by

substantial evidence because the Commission did not examine all the issues relating to the

shortfall in domestic production of certain orange juice, the opposition of certain domestic orange

juice processors to the petition, the impact of non-subject imports, the effects of PepsiCo's

imports of ultra low pulp orange juice ("ULPOJ"), and the need of U.S. producers to use Brazilian

imports for blending with domestic juice and for obtaining duty drawbacks for their U.S. exports.

The court agrees that the Commission did not examine all of the significant issues

relating to the shortfall in domestic production of certain orange juice, the opposition of certain

domestic orange juice processors to the petition, or the impact of non-subject imports.  The court

does not agree, however, that, as isolated matters, the Commission erred in not addressing the

effect of ULPOJ imports in its final determination or in finding that it is unnecessary to use

subject imports for blending with domestic juice or for obtaining duty drawbacks.

**A.**     **Consideration of the Shortfall in the Supply of Domestic Round Oranges**

Tropicana and the Plaintiff-Intervenors contend that the Commission erred in

discounting the effect of a shortfall in the production of the domestic like product on the domestic

industry.  Specifically, they argue that the volume of subject imports and the price effect of

subject imports are not significant because subject imports were necessary to remedy the short

supply of domestic oranges.  They reason that any injury experienced by the domestic industry is

due to the dramatic fall in the domestic production of certain orange juice in CY 2004/05.

Here, the Commission did find that subject imports were necessary to meet

domestic demand.  Final Determination, at 17–18.  The record also shows that the level of subject

imports is inversely related to the level of the domestic production of the like product – the

amount of subject imports rises when domestic production falls, and vice versa.[20]

Despite its own findings, the Commission concluded that the volume of the subject

imports and the price effect of the subject imports were significant and that subject imports were

causing material injury to the domestic industry.  Id. at 28.  The Commission's conclusion relied

heavily upon its finding that "Brazilian subject imports increasingly exceeded residual demand

throughout the period examined."  Id. at 19.  The Commission found that the volume of Brazilian

subject imports must have exceeded the volume necessary to counter domestic production

shortfalls because the volume of subject imports held in domestic inventory and the percentage of

inventories comprised of subject imports increased from CY 2003/04 to CY 2004/05.  Id. at 21.

Thus, the Commission found that the volume of subject imports, both absolute and relative to

domestic production and consumption, was significant,[21] id., and that the subject imports were

---

[20]The domestic production of certain orange juice decreased from approximately 1.432 billion gallons SSE in CY 2001/02 to 1.246 billion gallons SSE in CY 2002/03 before increasing to 1.471 billion gallons SSE in CY 2003/04 and then decreasing significantly to 1.006 billion gallons SSE in CY 2004/05.  Final Staff Report, at Table IV-6.  Meanwhile, the volume of subject imports increased from 109.7 million gallons SSE in CY 2001/02 to 227.3 million gallons SSE in CY 2002/03, then decreased to 154.2 million gallons SSE in CY 2003/04 before rising again to 231.7 million gallons SSE in CY 2004/05.  Final Determination, at 17 n.133.

[21]The parties do not appear to contest that the absolute volume of subject imports was significant.  Although a finding that the volume of subject imports is significant in absolute terms

suppressing prices because "lower inventories would have created upward pressure on domestic

prices of certain orange juice." Id. at 24. The Commission's determination is lacking.

    While the Commission relies upon its finding that subject imports increasingly

exceeded residual demand, the Commission never actually determined the level of residual

demand. As Plaintiff-Intervenor Dreyfus suggests, residual demand can be defined as the

difference between the domestic consumption and the domestic juice available.[22] When so

defined, the record shows that subject imports did not increasingly exceed residual demand but

fluctuated from year to year, increasing when domestic production was higher and decreasing

---

may be sufficient to support a finding of an overall significant volume of imports, see Hynix, 431
F. Supp. 2d at 1308, there nevertheless may be a negative determination if subject imports
contributed only minimally to the injury. Gerald Metals, 132 F.3d at 722.

  [22]The amount of domestic juice available each year can be defined as the sum of domestic
production for that year and the change in domestic inventory levels, whether positive or
negative.

when domestic production was lower.[23]   This may be easily explained by the difficulty in

predicting the exact production levels in order to adjust the level of subject imports to correspond

perfectly.  Furthermore, in the last year of the POI, the level of subject imports did not exceed the

residual demand but was actually insufficient to meet the domestic demand.  See supra, n.21.  The

Commission did not address this aspect of the problem.

Rather than examine the amount of residual demand throughout the POI to assess

whether the level of subject imports exceeded the level of residual demand in each year, the

Commission instead relied upon an increase in domestic inventory levels of subject imports from

---

[23]The data, in 1,000 gallons SSE, can be summarized as follows:

| CY | Domestic Production | Increase/ (Decrease) in Domestic Inventory Levels | Available Domestic Juice | Domestic Consumption | Residual Demand | Imports from Brazil | Excess of Imports over Residual Demand |
|---|---|---|---|---|---|---|---|
| 2001 /02 | 1,432,162 | (6,301) | 1,438,463 | 1,445,959 | 7,496 | 109,728 | 102,232 |
| 2002 /03 | 1,246,761 | 12,346 | 1,234,415 | 1,422,460 | 188,045 | 227,280 | 39,235 |
| 2003 /04 | 1,471,334 | 137,630 | 1,333,704 | 1,432,822 | 99,118 | 154,203 | 55,085 |
| 2004 /05 | 1,006,642 | (252,139) | 1,258,781 | 1,497,781 | 239,000 | 231,711 | (7,289) |

Final Staff Report, at Table IV-6.  In years when the domestic inventory levels decreased, more
juice was available for domestic consumption, and vice versa.
    The large excess in CY 2001/02 may be explained by the large decrease in domestic
consumption from the years preceding the POI to CY 2001/02.  During the four years prior to the
POI, domestic consumption was over 1.5 billion gallons SSE in each year, reaching 1.596 billion
gallons SSE in CY 1997/98.  Id.  In particular, domestic consumption was at 1.521 billion
gallons SSE in CY 2000/2001 before falling significantly to 1.445 billion gallons SSE in CY
2001/02.  Id.

the first year of the POI to the last year of the POI to negate the relationship between domestic

production levels and subject import levels.  Final Determination, at 20–21.  In so doing, the

Commission fails to address the fact that the level of Brazilian imports held in domestic inventory

actually fluctuated every year of the POI.  See id. at 21.  The level of Brazilian imports held in

domestic inventory increased from 33.8 million gallons SSE in CY 2001/02 to 41.8 million

gallons SSE in CY 2002/03, then fell to 26.6 million gallons SSE in CY 2003/04 before

increasing again to 51.3 million gallons SSE in CY 2004/05.  See id.  Likewise, the ratio of

subject imports in domestic inventory to the total ending stocks of domestic inventory also

fluctuated year to year, increasing from 4.9% in CY 2001/02 to 5.9 % in CY 2002/03 before

falling to 3.2% in CY 2003/04 and increasing again to 8.7% in CY 2004/05.  See id.  Meanwhile,

domestic production fell from 1.432 billion gallons SSE in CY 2001/02 to 1.246 billion gallons

SSE in CY 2002/03 before increasing to 1.471 billion gallons SSE in CY 2003/04 and then falling

again to 1.006 billion gallons SSE in CY 2004/05.  Final Staff Report, at Table IV-6.  As seen

here, the level of subject imports held in domestic inventory was inversely correlated to the level

of production of the domestic like product – rising when production levels fell and vice-versa.

        This correlation is likely explained by the need of the "domestic producers of

certain orange juice [to] maintain relatively large bulk juice inventories" to ensure their supply of

certain orange juice during fluctuations in domestic production.   Final Determination, at 15.  For

instance, the increase in the level of subject imports held in domestic inventory between CY

2003/04 and CY 2004/05 was accompanied by a dramatic decrease in production levels between

those crop years.[24]  In fact, the ending stocks of domestic inventory were lower in CY 2004/05

when compared to any other year in the POI.  Final Determination, at 21.  In light of the fact that

the domestic producers chose to maintain large bulk inventories, the domestic industry may very

well have needed to increase their imports of certain orange juice from Brazil to prevent the

inventory levels from falling even further.  The Commission's determination, however, did not

examine whether the domestic industry was importing certain orange juice from Brazil to

maintain a certain level of inventories in order to deal with volatility in domestic production.[25]  By

"fail[ing] to consider [several] important aspect[s] of the problem," the Commission's

determination is arbitrary and capricious.  See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State

Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  Thus, the court remands this issue to the

Commission to address.

---

[24]As previously stated, domestic production of certain orange juice fell from 1.471 billion
gallons SSE in CY 2003/04 to 1.006 billion gallons SSE in CY 2004/05.  Final Staff Report, at
Table IV-6.  Meanwhile, the subject imports in domestic inventory rose from 2.3% of total
available supply in CY 2001/02 to 3.4% of total available supply in CY 2004/05.  Final
Determination, at 26.

[25]The record is unclear as to the level of inventory that the domestic industry desires to
maintain.  One witness claims that domestic processors prefer to maintain an inventory level of
between 16 and 20 weeks of inventory but that during the POI, the inventory levels exceeded 20
weeks and became a costly liability.  (ITC Hr'g Tr. 52:10–22, Jan. 10, 2006).  The Commission
has not examined this in its determination and the record presented also does not address it
further.
       As previously stated, the record shows that during the POI, the size of the domestic
inventory of certain orange juice amounted to about one-half of the domestic production in any
given year.  Final Determination, at 15.  "The ratio of domestic producers' carryover stocks to
U.S. production increased from 48.3 percent in crop year 2001/02 to 56.5 percent in crop year
2002/03 to 57.2 percent in crop year 2003/04 to 58.6 percent in crop year 2004/05."  Id. at 15
n.111.

Relatedly, because the Commission has relied upon the increase in the level of subject imports held in domestic inventory to support its findings that the price effect of the subject imports is significant and that the subject imports have adversely impacted the domestic industry,  the Commission must also revisit those conclusions.  As to the price effects of subject imports, it is unclear why the Commission attributed a cost-price squeeze experienced by the domestic industry to the volume of Brazilian imports entering the U.S. without examining how demand factors, such as the limited increase in domestic consumption of certain orange juice during the POI,[26] may have prevented the domestic industry from raising prices.  See Final Determination, at 23–24.  The Commission should also consider how the low level of subject imports held in inventory, consisting at the most of 8.7 % of the domestic inventories during the POI, and less than 5% in two of the years of the POI, contributed significantly, rather than minimally, to the suppression of domestic prices.[27]  Id. at 21.

---

[26]As stated previously, in the four years prior to CY 2001/02, domestic consumption had been above 1.5 billion gallons SSE.  Final Staff Report, at Table IV-6.  It then fell from 1.521 billion gallons SSE in CY 2000/01 to 1.445 billion gallons SSE in CY 2001/02, 1.422 billion gallons SSE in CY 2002/03, before rising modestly to 1.432 billion gallons SSE in CY 2003/04 and then to 1.497 billion gallons SSE in CY 2004/05.  Id.

[27]The Government claims that because Tropicana did not raise arguments challenging the Commission's findings on the price effects of subject imports, Plaintiff-Intervenor Dreyfus' arguments relating to the Commission's findings on price effects fall outside the scope of this case.  Generally, a plaintiff-intervenor is "limited to the field of litigation open to the original parties, and cannot enlarge the issues tendered by or arising out of plaintiff's bill."  Torrington Co. v. United States, 14 CIT 56, 57, 731 F. Supp. 1073, 1075 (1990).

Here, although Tropicana did not expressly state that it was challenging the Commission's findings as to the price effects of subject imports, that challenge is necessarily implied by Tropicana's overall challenge of the Commission's reliance on the increasing level of subject imports held in domestic inventory to sever the causal connection between a shortage in the supply of domestic round oranges and injury to the domestic injury.  Thus, the court finds that Dreyfus' argument relating to the effect of the inventory levels of the subject import on the

As to the impact of the subject imports, the performance of the different domestic

processors varied depending on whether the processor was affected by the hurricanes in central

Florida in 2004.  For instance, processors which were not affected by the hurricanes, such as

Southern Gardens and Sunkist, were not negatively affected in CY 2004/05, while processors hit

hardest by the hurricanes were negatively affected.[28]  Final Determination (Confidential)

(Dissent), at 75.  Further, the Commission's statement that the domestic industry's share of the

domestic market declined over the POI does not sufficiently explain the situation here.  The

Commission failed to mention that the domestic industry's share of the domestic market is

directly correlated to domestic production levels of the like product, including round oranges.[29]  It

is not surprising that the domestic industry's share of the domestic market declined when there

was a tremendous fall in domestic production in CY 2004/05 because of orange shortages.  This

price of the domestic product to be within the scope of this case.

 The court further finds that Dreyfus' argument that there is no relationship between subject imports and domestic prices is also within the scope of this case.  Tropicana's challenge to the Commission's determination that subject imports caused material injury to the domestic industry implicitly entails a challenge to the determination that subject imports affected the domestic industry by suppressing domestic prices.  Here, Dreyfus pointed to the dissenting Commissioner's conclusion that monthly subject import volumes fluctuated significantly in a manner that did not correlate with fluctuations in prices.  Dreyfus' Br. 27–28.  The Commission did not consider this in its determination and should do so on remand.

 [28]Southern Gardens and Sunkist were [] in CY 2004/05 while processors hit hardest by the hurricanes were [] profitable.  Final Determination (Confidential) (Dissent), at 75.

 [29]As previously stated, "[d]omestic producers' market share declined from 87.2 percent in crop year 2001/02 to 79.9 percent in crop year 2002/03, increased to 84.8 percent in crop year 2003/04, and fell to 76.5 percent in crop year 2004/05."  Final Determination, at 25.  As previously stated, domestic production fell from 1.432 billion gallons SSE in CY 2001/02 to 1.246 billion gallons SSE in CY 2002/03 before increasing to 1.471 billion gallons SSE in CY 2003/04 and then falling again to 1.006 billion gallons SSE in CY 2004/05, the heavy hurricane period.  Final Staff Report, at Table IV-6.

would have occurred even if the level of subject imports had remained the same.  Likewise, it is

not surprising that the domestic industry experienced a decline in domestic capacity utilization

from the first year of the POI to the last year of the POI given the dramatic decline in domestic

production.

       In sum, the Commission's determination is not supported by substantial evidence

when the record as a whole is considered.  Instead, its decision is arbitrary and capricious because

it did not address many important issues relating to the effects of the short supply of domestic

oranges upon the domestic industry.  See Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (stating that

an agency's decision is arbitrary and capricious if it "fail[s] to consider an important aspect of the

problem, [or] offer[s] an explanation for its decision that runs counter to the evidence before the

agency").  Accordingly, the court remands this issue to the Commission to examine the all the

relevant issues relating to the impact of the shortfall in the domestic production of round oranges

on the domestic industry, including, but not limited to, the levels of residual demand, the inverse

correlation between inventory levels of subject imports and domestic production, and the need of

the domestic industry to maintain high inventories.

**B.**      **Consideration of a Majority of the Domestic Industry's Opposition to the Petition**

       Tropicana also claims that the Commission's determination is unsupported by

substantial evidence because it failed to consider the opposition of the vast majority of the

domestic processors to the petition.[30]  Tropicana essentially argues that the Commission's

---

[30][] of the processors opposed the petition.  <u>Final Determination (Confidential)</u>, at 41
n.197.

determination is undermined because the opposition to the petition from a majority of the

domestic industry reflects the domestic industry's belief that it was not negatively affected by the

subject imports.

In making its determination, the Commission must "consider the whole record and

whatever in the record fairly detracts from its finding."  Suramerica de Aleaciones Laminadas,

C.A. v. United States, 17 CIT 146, 164, 818 F. Supp. 348, 365 (1993).  This may include the

opposition of the industry because "[t]he industry's position is highly relevant to whether an

industry has been injured by imports."  Id. at 163, 818 F. Supp. at 364; Suramerica de Aleaciones

Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) ("The industry best knows its

own economic interests and, therefore, its views can be considered an economic factor.").  Thus,

although opposition to the petition by the majority of domestic producers does not preclude an

affirmative present material injury determination, the Commission must explain its rationale for

discounting the opposition of the majority of the domestic industry.[31]  Suramerica, 17 CIT at 165,

818 F. Supp. at 365.

---

[31]The Government argues that Suramerica is limited to the context of a threat of material
injury, and court should find as in Minebea Co. v. United States, 16 CIT 550, 794 F. Supp. 1161
(1992).  Minebea stated that "when the [Commission] is determining whether LTFV imports are
a cause of material injury suffered by a U.S. industry, the position of any segment of the U.S.
industry as to the cause of its difficulties is not something which the [Commission] is required to
consider."  Id. at 554, 794 F. Supp. at 1165.  Minebea, however, is not applicable here.  As
Suramerica explained, Minebea did not involve a challenge that the Commission's determination
was not supported by substantial evidence, rather it involved an issue of law.  Suramerica, 17
CIT at 163, 818 F. Supp. at 364.  When "the heart of the issue is whether the [Commission's]
determination was based on substantial evidence," as in this case, "[t]he industry's position is
highly relevant to whether an industry has been injured by imports."  Id. (emphasis added).

In its final determination, the Commission briefly discussed the industry's

opposition to the petition, stating in a footnote that:

> [it] recognize[d] that U.S. processors accounting for [the majority] of U.S. certain
> orange juice production in crop year 2004/05 oppose the petition in this final phase
> investigation. . . . While the degree of support by members of the domestic industry
> for the petition may be a factor considered by the Commission, such a factor is not
> dispositive.  Indeed, the Commission has issued an affirmative determination even
> when a substantial percentage of the industry opposed the petition.

Final Determination (Confidential), at 41 n.197 (citation omitted).

The Government argues that the Commission had sufficiently considered the

opposition of the domestic industry to the petition and asks the court to hold as it did in Citrosuco

Paulista, S.A. v. United States, 12 CIT 1196, 1216, 704 F. Supp. 1075, 1093 (1988).   In

Citrosuco, the Commission expressly found that the processors opposing the petition were more

dependent upon Brazilian imports than those supporting the petition.  Id.  The Commission then

concluded that the processors opposing the petition did not adequately reflect the economic

interest of all the processors and the Commission discounted their opposition to the petition.  Id.

The court affirmed the determination, holding that the Commission had properly considered and

discounted the opposition to the petition.  Id. at 1217, 704 F. Supp. at 1093.

This case, however, is unlike Citrosuco.  While Citrosuco found that the processors

opposing the position did not reflect the interests of all the domestic processors, the Commission

here made no such finding.[32]  Unlike in Citrosuco, here, the Commission did not explain why the

---

[32]The Commission here did find that many domestic processors imported from Brazil.
Final Determination, at 12–13.  The Commission, however, did not find that these processors
"derived any significant finances benefits from their relationships with Brazilian operations" and
did not exclude them from the analysis of the domestic industry.  Id. at 13.

opposition of the domestic industry did not cast doubt upon the Commission's findings.  See Final

Determination (Confidential), at 41 n.197.  Instead, the Commission summarily concluded that the

industry's opposition to the petition is "not dispositive."  Id.  This is not an explanation for its

actions.  Given that the Commission has implicitly chosen to weigh the domestic processors' data

more heavily than that of the domestic growers, and that very few growers actually responded to

the questionnaire in order to support the petition, it is particularly troubling that the Commission

did not explain why it chose to discount the apparent opinion of the majority of domestic

processors.

Accordingly, because the Commission did not explain why the domestic industry's

opposition to the petition did not undermine its affirmative determination of material injury by

reason of subject imports, this case is also remanded on this ground.  See Timken U.S. Corp. v.

United States, 421 F.3d 1350, 1355 (Fed. Cir. 2005) (agency decision is arbitrary and capricious if

the agency "'entirely failed to consider an important aspect of the problem'") (quoting Motor

Vehicle Mfrs. Ass'n, 483 U.S. at 43).  On remand, the Commission must consider the domestic

industry's position to the petition and explain how a finding of material injury by reasons of

subject imports can be supported despite the opposition of a large portion of the industry.

### C.    Consideration of Non-Subject Imports

Tropicana also argues that the Commission failed to consider the effect of non-

subject imports on the domestic industry as required by Gerald Metals.  Tropicana argues that

such an analysis is especially appropriate in this case because a large Brazilian producer of certain

orange juice, Citrovita, is not subject to the current investigation.  Tropicana claims that Citrovita

has the capacity to replace the subject imports in the domestic market completely.[33]  Tropicana

thus argues that the Commission erred by not considering whether an affirmative determination

would fail to benefit the domestic industry.

As previously stated, in addition to considering the volume, price effects, and the

impact of subject imports on the domestic industry, the Commission "may consider such other

economic factors as are relevant to the determination regarding whether there is material injury by

reason of imports." 19 U.S.C. § 1677(7)(B)(ii).  "The effect of non-subject imports . . . is often a

relevant 'other economic factor' that the Commission looks at when considering whether a

particular domestic injury was caused by the subject imports."  Caribbean Ispat Ltd. v. United

States, 450 F.3d 1336, 1338 (Fed. Cir. 2006).

In Gerald Metals, the Commission determined that Ukranian imports of pure

magnesium at LTFV injured the domestic industry without discussing whether non-subject

imports would have replaced all or a great part of the subject imports.  132 F.3d at 718–19.  This

was particularly important given that the non-subject imports were perfect substitutes for the

Ukranian subject imports and also frequently undersold the domestic like product.  Id. at 718–19.

Thus, the Federal Circuit stated that

> While the statute protects domestic magnesium producers from injury caused by
> LTFV imports, its scope of protection does not reach so far as to support artificially
> inflated prices when fairly-traded imports are underselling the domestic product and

---

[33]As previously discussed, Citrovita is a Brazilian producer of certain orange juice.
Citrovita is not covered by the scope of the antidumping duty investigation and thus, its imports
are considered non-subject imports.  The record does not discuss whether non-subject imports of
certain orange juice from Citrovita or other non-subject importers are interchangeable with
subject imports, although the parties seem to accept that this is the case.

LTFV imports are readily convertible to fairly-traded product by merely ichanging importers.

Id. at 722.

The Federal Circuit later confirmed Gerald Metals and further stated that:

Where commodity products are at issue and fairly traded, price competitive, non-subject imports are in the market, the Commission must explain why the elimination of subject imports would benefit the domestic industry instead of resulting in the non-subject imports' replacement of the subject imports' market share without any beneficial impact on domestic producers.

Bratsk, 444 F.3d at 1373 (emphasis added). Although the existence of competitive non-subject imports of a commodity product does not necessitate a finding of no causation between the subject imports and injury to the domestic industry, the Commission is obligated to address whether non-subject imports would have replaced subject imports "whenever the antidumping investigation is centered on a commodity product, and price competitive non-subject imports are a significant factor in the market." Id. at 1375; see also Sichuan Changhong Elec. Co. v. United States, 466 F. Supp. 2d 1323, 1333 (CIT 2006) (remanding for the Commission to reexamine its determination in light of Bratsk).

Here, the Commission briefly discussed non-subject imports in its determination, noting that the non-subject imports did not gain as much of a share of the domestic market as the subject imports did. Final Determination, at 19. The Commission also noted that "while the volume of nonsubject imports rose over the period examined, they grew at a slower rate and represented a smaller share of apparent consumption than Brazilian subject imports." Id. at 27–28. This examination may not be sufficient to support the Commission's affirmative determination.

Rather, the Commission may be obligated under <u>Bratsk</u> to address further "whether the non-subject imports would have replaced subject imports during the period of investigation." 444 F.3d at 1376.  The record suggests that the factors triggering the obligation to make such an inquiry – the commodity nature of the product and the significant presence of price competitive non-subject imports – may exist here.  First, the Government does not dispute Tropicana's argument that orange juice is a commodity and that FCOJM futures are traded on the New York Board of Trade, a commodity market.  <u>Final Determination (Dissent)</u>, at 40.  Second, the record indicates that although non-subject imports were priced higher than the subject imports in CY 2001/02 and CY 2002/03, they were priced lower than the subject imports during CY 2003/04 and CY 2004/05.  <u>Final Staff Report</u>, at Table IV-2.

Further, the non-subject imports may be a significant factor in the U.S. market.  In <u>Bratsk</u>, the Federal Circuit held that non-subject imports were a significant factor in the U.S. market after noting that non-subject imports' share of the total imports ranged from 73.0% to 82.6% during the POI.  444 F.3d at 1375.  In this case, by quantity, non-subject imports comprised 40.8% of total imports in CY 2001/02, 20.8% in CY 2002/03, 29.4% in CY 2003/04, and 34.2% in CY 2004/05.[34]  <u>Final Staff Report</u>, at Table IV-2.  Although the non-subject imports in this case comprised a smaller portion of total imports than the non-subject imports in <u>Bratsk</u> did, it is not so small a portion as to be an indisputably insignificant factor in the market.  Thus, the issue must be addressed.

---

[34]By value, non-subject imports comprised of 51.0% of total imports in CY 2001/02, 24.0% in CY 2002/03, 27.3% in CY 2003/04, and 32.0% in CY 2004/05.  <u>Final Staff Report</u>, at Table IV-2.


The Government argues that non-subject imports would not have replaced the subject imports during the POI, presumably because non-subject imports comprised a smaller portion of the domestic market than subject imports.  The non-subject imports did comprise a small portion of the overall domestic market.  <u>Final Determination</u>, at 19 n.137.  The Commission, however, has not discussed, nor does the record address, the production capacity of non-subject importers, other than that of Citrovita.   As <u>Bratsk</u> stated, "it may well be that non-subject importers lack capacity to replace the subject imports or that the price of the non-subject imports is sufficiently above the subject imports such that the elimination of the subject imports would have benefitted the domestic industry."  444 F.3d at 1376.  It is, however, the Commission's job to explain whether non-subject imports would have replaced subject imports if subject imports prices reflected fair value.

Thus, the court remands for the Commission to examine: (1) whether the product at issue is in fact a commodity interchangeable with the subject imports (the parties seem to accept that this is the case, but the Commission should make this finding); (2) whether the non-subject imports are competitively priced and a significant factor in the domestic market; and (3) whether, if the subject imports were sold at fair value, the non-subject imports would replace the subject imports without any beneficial effect on domestic producers.

**D.      Consideration of Imports of Ultra Low Pulp Orange Juice**

Tropicana also argues that the Commission erred by failing to account for the fact that "imports of 'ultra low pulp' FCOJM (ULPOJ) made by Tropicana's corporate parent, PepsiCo, do not compete with the domestic like product."  Pl.'s Br. 33.  Tropicana claims that the ULPOJ imported by its parent company has no domestic counterpart, is produced using special

equipment and a proprietary process available only in Brazil, and is used solely to produce

"Mountain Dew" soft drink concentrate.  Tropicana argues that ULPOJ is thus non-injurious to

the domestic industry and the Commission should have "disregarded [it] in the analysis of

whether the subject imports are causing material injury to the domestic injury."[35] Id. at 34.

       As stated previously, in making its determination, the Commission has a duty "to

ensure that it is not attributing injury from other sources to the subject imports," Taiwan

Semiconductor, 266 F.3d at 1345 (citation and quotation marks omitted) (emphasis removed), and

to "analyze compelling arguments that purport to demonstrate the comparatively marginal role of

subject imports in causing that injury."  Hynix, 431 F. Supp. 2d at 1317.  Here, if Tropicana's

imports of ULPOJ were not competitive with the domestic like product, then the presence of

ULPOJ within the subject imports might undermine the Commission's determination that subject

imports played a significant role in causing material injury to the domestic injury.

---

    [35]Apparently based on Tropicana's use of the word "disregarded," the Government argues that Tropicana's argument fails because (1) Tropicana is asking the Commission to act contrary to 19 U.S.C. § 1677(7)(B)(1) by analyzing ULPOJ separately from the rest of the subject imports instead of analyzing the total volume of the subject imports; (2) the issue is not properly before this court because Tropicana did not ask the Commission to segment its analysis of ULPOJ imports; and (3) Tropicana is improperly challenging the Commission's like product determination and Commerce's scope determination.  The Government, however, has hinged its argument on hyper-technicalities.

    In its reply, Tropicana clarified that its challenge on appeal is the same as its challenge to the Commission: that the Commission should consider whether the non-injurious nature of the ULPOJ and its presence within the volume of subject imports undermines the Commission's affirmative determination that subject imports caused material injury to the domestic industry.  Pl.'s Reply Br. 13–14.  Tropicana does not appear to request that the Commission segment its analysis of the ULPOJ from the rest of the subject imports, nor does it appear to challenge the Commission's like product determination.

The record, however, indicates that, if the Commission's determination were otherwise sound, even if imports of ULPOJ were not competitive with the domestic like product, the determination would not be significantly undermined because of the low volume of such imports.[36]  See Nat'l Ass'n of Mirror Mfrs v. United States, 12 CIT 771, 780, 696 F. Supp. 642,649 (CIT ) (stating that the Commission need only discuss "material issues of law or fact") (quoting Jeannette Sheet Glass Corp. v. United States, 9 CIT 154, 161, 607 F. Supp. 123, 130 (1985)).  The Commission is free to reexamine this matter if it becomes significant upon reweighing of other data.

**E.      Consideration of the Need for Subject Imports for Blending with Domestic Like Products and for Obtaining Drawback Duties**

Plaintiff-Intervenor Dreyfus also raises other challenges to the Commission's volume determination regarding the use of subject imports for blending with domestic juice and for obtaining drawback of duties.  Dreyfus argues that because subject imports were necessary for blending with domestic juice and for obtaining duty drawbacks, the Commission erred in finding that the volume of subject imports was significant.[37]  The court reviews each argument in turn.

---

[36]Here, Tropicana states that from August 2004 through July 2005, PepsiCo's imports totaled [] pounds solids, which amounted to only [] of subject imports.  Pl.'s Br. 35.  PepsiCo's questionnaire also indicates that PepsiCo's imports do not consist entirely of ULPOJ.  Def.'s Appx. at Tab CR 206 (PepsiCo's Importer Questionnaire at II-4).

[37]The Government argues that Dreyfus is not permitted to raise arguments concerning the use of subject imports for blending with domestic orange juice and for obtaining drawback of duties because neither argument was raised specifically by Tropicana.  The Government relies on Parkdale Int'l v. United States, 429 F. Supp. 2d 1324, 1337–38 (CIT 2006), and Torrington Co. v. United States, 14 CIT at 57, 731 F. Supp. at 1075, to support its argument.  In both Parkdale and Torrington, the plaintiff-intervenors raised arguments that did not merely support the plaintiffs' original claim but were far removed from it.  See Parkdale, 429 F. Supp. 2d at 1337 (plaintiffs challenged the unlawful retroactive application of the reseller policy while the

The Commission here considered testimony that subject imports were necessary for blending with domestic juice to meet quality standards. Final Determination, at 16–17. Although the Commission agrees that blending is a common practice in the orange juice industry and serves several purposes,[38] the Commission rejected the argument that U.S. producers need to import Brazilian juice specifically to blend with domestic juice. Id. at 17. Rather, the Commission found that the majority of responding U.S. purchasers stated that they did not need to blend domestic juice with the subject imports and that the subject imports was comparable in USDA grade and viscosity to, and were actually interchangeable with, the domestic juice. Id. The Commission thus held that the domestic like product did not need to be blended with subject imports in order to achieve certain quality specifications. This conclusion of no necessity is supported, but blending is desirable and the domestic industry may benefit from a wider array of imported products. This fact may affect other areas of the determination and should be considered.

The record also indicates that the Commission considered arguments that subject imports were necessary to aid U.S. exports. Respondents had argued that U.S. producers needed

---

plaintiff-intervenor presented an additional argument that Commerce did not provide it with practicable assistance under 19 U.S.C. § 1677m(c)); Torrington, 14 CIT at 57, 731 F. Supp. at 1075 (plaintiff-intervenor brought a standing argument that was not raised by the plaintiff). In contrast, in this case, Tropicana brought a broad challenge to the Commission's finding that the volume of subject imports was significant. Compl. at ¶ 9. Thus, insofar as Dreyfus argues that the use of subject imports for blending with domestic orange juice and for obtaining drawback duties causes the volume of the subject imports to be insignificant, the arguments merely support the claims made and are within the scope of this case.

[38]Blending allows producers to manufacture juice of a certain quality specification and to satisfy origin labeling requirements at the retail level. Final Determination, at 16.

Brazilian imports in order to use the duty drawbacks from Brazilian imports to offset the higher

prices of their juice.  <u>Final Determination</u>, at 20 n.142.  While the duty drawback program does

help facilitate U.S. exports, the Commission found that the domestic industry did not need

Brazilian imports in order to export its own like product.  <u>Id.</u> at 19–20.  The Commission found

that the fact that the value of drawback credits available significantly exceeded the value of

domestic exports demonstrated that there is little correlation between U.S. exports and the

availability of drawback credits.  <u>Id.</u> at 19–20, 20 n.142.  The court agrees that the record supports

the conclusion that, although duty drawbacks help facilitate U.S. exports, duty drawbacks are not

a major factor in spurring U.S. exports.

## CONCLUSION

For the foregoing reasons, the court remands the affirmative determination to the

Commission.  As previously discussed, the Commission's inventory analysis is seriously flawed

for failure to consider, among other factors, the residual demand, the inverse correlation between

inventory levels of subject imports and domestic production, and the domestic industry's

voluntary maintenance of high inventories.  Thus, upon remand, the Commission must examine

the full effects of a shortage in the supply of domestic round oranges, and how that affects the

Commission's volume and price effects analysis.  Additionally, the Commission must examine:

the opposition to the petition by a large portion of the domestic industry; whether, if prices were

adjusted to account for the LTFV margin, non-subject imports would displace subject imports;

and its price suppression analysis.

Further, although the Commission's determinations as to the collection of data, the

lack of consideration of ULPOJ imports, and the role of blending are not erroneous when viewed

in isolation, the weakness of the overall analysis and the relatedness of the issues may cause these

matters to be significant in the context of a more comprehensive analysis.  Given the relatedness

of the issues, upon remand, the Commission must not only examine the four deficiencies noted

above but must also consider the totality of the evidence anew.  In so doing, the Commission must

not seize upon bits of evidence to reject what the bulk of the evidence dictates.  Additionally,

while the court understands that the dissent is not under direct assault here, the dissent's finding of

no causation appears to be more logical and supported than the Commission's finding of

causation.  It would be helpful upon remand for the Commission to engage the dissent.

        The Commission's present determination acknowledges that weather and disease

caused an increase in the demand for imports but does not offer sufficient evidentiary support, or

adequate explanation, for its findings that subject imports were greater than necessary to meet that

demand and that the inventory levels of these subject imports over the course of the POI

prevented price increases that otherwise would have occurred.  In a volatile supply condition,

which the Commission acknowledges, not the least by the breadth of the POI here, significant

inventory is necessary.  If inventory is the key, it needs an in-depth analysis.

        If it finds it necessary or efficacious, the Commission may reopen the record.  The

Commission should render a determination upon remand within 75 days hereof.  Objections may

be filed 20 days thereafter.  Response may be filed within 11 days.


                                                    ___/s/ Jane A. Restani_____
                                                    Jane A. Restani
                                                    Chief Judge

Dated this 12th day of April, 2007.
New York, New York.

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____        By: _____
                                                          Deputy Clerk