**SLIP OP. 08-17**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

TROPICANA PRODUCTS, INC.,

Plaintiff,

and

LOUIS DREYFUS CITRUS, INC., and FISCHER S/A AGROINDUSTRIA,

Plaintiff-Intervenors,

v.

UNITED STATES,

Defendant,

and

A. DUDA & SONS, INC., CITRUS WORLD, INC., FLORIDA CITRUS MUTUAL, SOUTHERN GARDENS CITRUS PROCESSING CORP., and THE COCA-COLA COMPANY,

Defendant-Intervenors.

Before: Jane A. Restani, Chief Judge

Court No. 06-00109

**Public Version**

OPINION

[Defendant United States' determination on remand of material injury by reason of subject imports affirmed.]

Dated: February 5, 2008

Neville Peterson, LLP (John M. Peterson, Catherine C. Chen, George W. Thompson, and Michael K. Tomenga) for the plaintiff.

Vinson & Elkins, LLP (Christopher A. Dunn and Valerie S. Ellis) for the plaintiff-intervenor Louis Dreyfus Citrus, Inc.

Kalik Lewin (Robert G. Kalik and Brenna S. Lenchak) for the plaintiff-intervenor Fischer S/A Agroindustria.

Jeffrey S. Bucholtz, Acting Assistant Attorney General; Jeanne E. Davidson, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Michael J. Dierberg) for the defendant.

James M. Lyons, General Counsel, U.S. International Trade Commission (David A.J. Goldfine and Andrea C. Casson) for the defendant.

Barnes, Richardson & Colburn (Stephen W. Brophy) for defendant-intervenors A. Duda & Sons, Inc., Citrus World, Inc., Florida Citrus Mutual, and Southern Gardens Citrus Processing Corp.

Crowell & Moring, LLP (Jeffrey L. Snyder and Alexander H. Schaefer) for the defendant-intervenor the Coca-Cola Company.


Restani, Chief Judge:  This matter arises from plaintiff Tropicana Products, Inc.'s ("Tropicana") challenge to the International Trade Commission's ("Commission") affirmative material injury determination with respect to certain orange juice from Brazil.  After two remand orders by the court for the Commission to reconsider and explain its determination, see Tropicana Products, Inc. v. United States, 484 F. Supp. 2d 1330, 1353–54 (CIT 2007) ("Tropicana I"); Tropicana Products, Inc. v. United States, Slip Op. 07-141, 2007 WL 2717874, at *13 (CIT 2007) ("Tropicana II"), the Commission again issued an affirmative determination, Certain Orange Juice From Brazil, USITC Pub. 3958, Inv. No. 731-TA-1089 (Oct. 2007) ("Second Remand Determination").  In the Second Remand Determination, the Commission addressed the court's concerns and supported its conclusions with substantial evidence.  The court will therefore affirm the Commission's determination.

Case 1:06-cv-00109-JAR Document 134 Filed 02/05/08 Page 3 of 22

## BACKGROUND

This matter began in December 2004, when several domestic producers of certain orange juice petitioned the Commission and the Department of Commerce ("Commerce"), alleging material injury or threat of material injury by reason of imports of certain orange juice from Brazil. See Tropicana I, 484 F. Supp. 2d at 1332–33. Following Commerce's investigation and determination that certain orange juice from Brazil was being sold at less than fair value ("LTFV"), see Certain Orange Juice From Brazil, 71 Fed. Reg. 2,183 (Dep't Commerce Jan. 13, 2006) (notice of final determination of sales at less than fair value and affirmative final determination of critical circumstances), the Commission issued an affirmative material injury determination on the basis of data from crop years ("CY") 2001/02 through 2004/05. See Certain Orange Juice From Brazil, USITC Pub. 3838, Inv. No. 731-TA-1089 (Mar. 2006) ("Original Determination").

Tropicana challenged the Commission's determination, and the court remanded the decision with instructions for the Commission to reconsider "the full effects of a shortage in the supply of domestic round oranges, and how that affects the Commission's volume and price effects analysis[;]" "the opposition to the petition by a large portion of the domestic industry; whether, if prices were adjusted to account for the LTFV margin, non-subject imports would displace subject imports; and its price suppression analysis." Tropicana I, 484 F. Supp. 2d at 1353. "Given the relatedness of the issues," the court asked the Commission to "consider the totality of the evidence anew." Id.

On the first remand, the Commission reconsidered each issue and maintained its affirmative material injury determination.[1] Certain Orange Juice From Brazil, USITC Pub. 3930, Inv. No. 731-TA-1089 (June 2007) ("First Remand Determination"). Tropicana challenged the Commission's determination, and the court again remanded for the Commission to explain "its conclusions as to the inverse correlation between subject imports and domestic production," and to conduct a sufficient analysis under Bratsk Aluminium Smelter v. United States, 444 F.3d 1369 (Fed. Cir. 2006). Tropicana II, at *13. The court noted that "'in any remand,'" the Commission considers "'the entire record in light of any new findings' it has made." Id. at *13 n.11 (quoting First Remand Determination, at *15–16).

On the second remand, the Commission addressed the issues raised in Tropicana II and again reached an affirmative material injury determination. See Second Remand Determination, at *1. Subject to its updated findings and explanations, the Commission also adopted the views expressed in the Original Determination and First Remand Determination. Id. Tropicana contests the Commission's determination, arguing that the Commission's analysis is erroneous and unsupported by record evidence.

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000). The court will uphold the Commission's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (2000).

---

[1]In each determination, three Commissioners reached affirmative determinations, and three Commissioners reached negative determinations. See Second Remand Determination, at *1 n.2, n.3. Under 19 U.S.C. § 1677(11), a tie vote is deemed an affirmative determination. 19 U.S.C. § 1677(11) (2000).

**DISCUSSION**

As stated in Tropicana I and II, to reach an affirmative determination, the Commission must find a "'present material injury or a threat thereof,'" and "causation of such harm by reason of subject imports." Tropicana I, 484 F. Supp. 2d at 1333 (quoting Hynix Semiconductor, Inc. v. United States, 431 F. Supp. 2d 1302, 1306 (CIT 2006)); see also Tropicana II, at *5. The Commission must consider: "(I) the volume of imports of the subject merchandise, (II) the effect of imports of that merchandise on prices . . . for domestic like products, and (III) the impact of imports of such merchandise on domestic producers of domestic like products, but only in the context of production operations within the United States," 19 U.S.C. § 1677(7)(B)(i), and "must analyze contradictory evidence or evidence from which conflicting inferences could be drawn, to ensure that the subject imports are causing the injury," Taiwan Semiconductor Indus. Ass'n v. ITC, 266 F.3d 1339, 1345 (Fed. Cir. 2001) (citations and quotation marks omitted). The Commission must show that the harm is "not inconsequential, immaterial, or unimportant," 19 U.S.C. § 1677(7)(A), and that there is a "causal – not merely temporal – connection between the [subject imports] and the material injury," Gerald Metals, Inc. v. United States, 132 F.3d 716, 720 (Fed. Cir. 1997).

**I. Inverse Correlation Between Domestic Production and Subject Imports**

In Tropicana II, the court noted that data provided in a footnote in the First Remand Determination failed to support the Commission's finding that, "'[t]o the extent there is an inverse correlation between domestic production and subject imports, . . . the magnitude of any such correlation is questionable on this record [because] [s]ubject import volumes were virtually identical in two crop years when domestic production levels varied substantially.'"

Case 1:06-cv-00109-JAR Document 134 Filed 02/05/08 Page 6 of 22

Tropicana II, at *6–7 (quoting First Remand Determination, at *8–9 n.47). The court stated that it "is uncertain how the Commission obtained its data regarding domestic production," and remanded for the Commission to reconsider the apparent inverse correlation between subject imports and domestic production levels. Tropicana II, at *7–8.

In the Second Remand Determination, the Commission explained that, in the footnote in question, it had "inadvertently referenced data concerning domestic orange production rather than the data it had otherwise relied upon elsewhere in its determination concerning domestic orange juice production."[2] Second Remand Determination, at *2. Using the correct data,[3] the Commission again found that "subject import volumes were virtually

---

[2]The Commission also noted that:

> [T]he same point is true even when domestic production is measured by the volume of oranges, a measure which makes some sense given that respondents' arguments focus on the alleged shortages in domestic orange juice production due to diminished orange crops. Despite substantial fluctuations in orange crop levels in crop years 2002/03 and 2004/05, subject imports were virtually identical in those two crop years. In crop year 2002/03, the Florida orange crop totaled 203.0 million boxes, while subject imports totaled 227.3 million gallons SSE. In crop year 2004/05, the Florida orange crop totaled 149.6 million boxes, while subject imports totaled 231.7 million gallons SSE. . . . In other words, regardless of whether domestic orange juice production or domestic orange production is examined, the end result is the same: subject imports were at virtually consistent levels in two crop years, while domestic production of oranges and orange juice varied substantially.

Second Remand Determination, at *2 n.5.

[3]The Commission stated that:

> Throughout the first remand determination, as in the original determination, the Commission found that domestic production of certain orange juice fell from 1.43 billion gallons SSE in crop year 2001/02 to 1.25 billion gallons SSE in crop year

(continued...)

identical in two crop years when domestic orange juice production varied substantially, thereby

attenuating the magnitude of any inverse correlation between domestic production and subject

imports." Id.  The Commission concluded that, to the extent that there existed an apparent

inverse correlation as noted by the court, such correlation was outweighed by other evidence on

the record indicating that "the volume of subject imports was significant, and injurious to the

domestic industry, throughout the POI [period of investigation]." Id. at *3.

            In support of its conclusion, the Commission pointed to evidence on the record

showing that "increases in subject imports were [not] solely or even primarily the result of

declines in domestic production, because there were other factors in play." Id.  The Commission

noted that, "notwithstanding any inverse relationship between subject imports and domestic

production, the record reflects a more significant, . . . positive[ ] correlation among subject

imports, subject merchandise inventory, and Brazilian production of orange juice." Id.; see also

First Remand Determination, at *12–13 (citing Original Determination (Confidential), at Tables

VII-5, C-3).  The Commission explained that "this positive correlation strongly suggests that . . .

subject imports were [not] merely 'pulled' into the market to offset a domestic supply shortfall."

Second Remand Determination, at *3.  In addition, the Commission noted "ample evidence in

the record demonstrating that the volume of subject imports entering the U.S. market in the final

---

[3](...continued)
2002/03, increased to 1.47 billion gallons SSE in crop year 2003/04, and dropped
to 1.01 billion gallons SSE in crop year 2004/05. . . . The Commission intended to
reference this domestic orange juice production data in footnote 47 just as it did in
all other instances in which it discussed production data.

Second Remand Determination, at *2.  These numbers are the same as those noted by the court
in Tropicana I and II.  See, e.g., Tropicana II at *7–8.

crop year after the hurricanes . . . was higher than necessary to meet residual demand and limited the ability of domestic producers to sell their total available supply, inclusive of inventories, in the domestic market." Id.; see also First Remand Determination, at *13–14; Original Determination, at Table IV-6.

Although the Commission could have provided more discussion of the possible causes of the apparent inverse correlation between subject import volume and domestic production as raised in Tropicana I and II, the court finds that the Commission's explanation is sufficient, and the determination is supported by substantial evidence on the record. While the court could draw a different conclusion from the evidence presented, "'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" Allegheny Ludlum Corp. v. United States, 475 F. Supp. 2d 1370, 1374 (CIT 2006) (quoting Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984)). Accordingly, the Commission's conclusion on this issue is affirmed.

**II. Non-Subject Imports**

In Tropicana II, the court also instructed the Commission to reconsider its finding that non-subject imports were "'not a significant factor in the U.S. market,'" pursuant to the requirements of Gerald Metals, 132 F.3d at 720, and Bratsk, 444 F.3d 1369, 1373. Tropicana II, at *8–9, 13 (quoting First Remand Determination, at *18). The court found that, although the Commission performed both steps of the Bratsk analysis in the First Remand Determination, as required by Tropicana I, the Commission "did not base its conclusion of insignificance on substantial evidence." Tropicana II, at *11. The court stated in Tropicana II that it "cannot

accept the Commission's conclusion that the volume of non-subject imports comprising only a

slightly smaller percentage of apparent consumption and as much as 40.8% in the first year of

the POI of all imports is insignificant," based on the evidence provided in the First Remand

Determination. Id. (citing First Remand Determination, at Table I-5). The court again remanded

for the Commission to "examine whether non-subject imports would replace subject imports if

prices of subject imports reflected fair value." Id. at *12.

      In the Second Remand Determination, the Commission "examined non-subject

imports, both individually and collectively, from the only non-subject Brazilian producer (i.e.,

Citrovita) and the three primary non-subject country suppliers (i.e., Belize, Costa Rica, and

Mexico)," and concluded that non-subject imports would not have replaced subject imports

during the period of investigation. Second Remand Determination, at *4, 7.

      With respect to the non-subject Brazilian producer, the Commission found that

Citrovita "[[   ]][4] orange juice to the United States [[   ]] during the POI," indicating that it "made

a strategic decision to [[   ]] exporting orange juice to the United States while it was subject to an

antidumping duty order in another [unrelated] investigation." Second Remand Determination

(Confidential), at *6–7. The Commission found that "[t]here is no reason to conclude . . . that

Citrovita would have exported significant quantities to the United States even after revocation of

that order." Second Remand Determination, at *4. Based on Citrovita's projected capacity

utilization rates and exports to the United States in crop years 2005/06 and 2006/07,[5] the

---

[4]Confidential information is denoted by double brackets throughout this opinion.

[5]The Commission found that:

(continued...)

Commission concluded that Citrovita's projected exports "will continue to be devoted [[ ]] for European and Asian markets." Second Remand Determination (Confidential), at *7. For these reasons, the Commission found that non-subject imports from Citrovita would not have substantially replaced subject imports in the U.S. market.

With respect to non-subject imports from Belize, Costa Rica, and Mexico, the Commission also found that "either individually or collectively[,] [the non-subject imports] could not have, and therefore would not have, replaced subject imports had the subject imports been fairly traded." Second Remand Determination, at *5. The Commission found that, "[i]n crop year 2004/05, total exports from Belize were 25,900 metric tons or 36.1 million gallons SSE," and "non-subject imports from Belize into the U.S. market were 30.4 million gallons SSE," id., meaning that "any additional non-subject imports from Belize diverted to the U.S. market from other export markets could have replaced only 2.5 percent of Brazilian subject imports." Id. Similarly, the Commission found that "even [if] producers in Costa Rica could have shifted all of their non-U.S. exports to the United States in 2004/05, this would represent only an additional 26.5 million gallons SSE in non-subject imports from Costa Rica into the U.S. market," meaning that "any additional non-subject imports from Costa Rica . . . could have

---

[5](...continued)
At several times during the POI . . . Citrovita reported capacity utilization rates exceeding [[ ]] percent, indicating that it did not possess [[ ]], even without exporting [[ ]] orange juice to the United States. Likewise, Citrovita has projected [[ ]] percent capacity utilization rates in crop years 2005/06 and 2006/07 while also projecting [[ ]] exports to the United States in those two crop years.

Second Remand Determination (Confidential), at *7.

replaced only 11.4 percent of Brazilian subject imports." Id. The Commission determined that a shift of non-subject imports from Mexico into the U.S. market could represent "only an additional 41.1 million gallons SSE," or "17.7 percent of Brazilian subject imports in the U.S. market." Id. at *6. The Commission noted that "Mexican producers have limited ability to increase exports to the United States," due to fluctuations in production and increased demand in Mexico. Id. Accordingly, the Commission found that "non-subject imports from Belize, Costa Rica, and Mexico could not have replaced subject imports in the U.S. market," because "any additional non-subject imports from Belize, Costa Rica, and Mexico diverted from other export markets to the U.S. market could have replaced only 31.5 percent of Brazilian subject imports." Id.

In conjunction with its findings and explanation set forth in the First Remand Determination, the Commission has provided substantial evidence in support of its finding that non-subject imports would not likely replace the subject imports' market share in the U.S. market if subject imports were eliminated, as required under Bratsk. The Commission's findings with respect to non-subject imports are therefore affirmed.

## III. Shortfall in the Supply of Domestic Round Oranges

In Tropicana I, the court instructed the Commission to reconsider the effects of the shortfall in the supply of domestic round oranges, including the Commission's findings on residual demand and the price effects of subject imports. See Tropicana I, 484 F. Supp. 2d at 1344, 1346. The court did not reexamine these issues in Tropicana II, due to its finding of significant flaws in other areas of the Commission's analysis. See Tropicana II, at *4.

**A.      Residual Demand**

In Tropicana I, the court criticized the Commission's finding that "'Brazilian subject imports increasingly exceeded residual demand,'" without actually calculating the level of residual demand.  Tropicana I, 484 F. Supp. 2d at 1344 (quoting Original Determination, at *19).  The court also instructed the Commission to examine "whether the domestic industry was importing certain orange juice from Brazil to maintain a certain level of inventories in order to deal with volatility in domestic production."  Id. at 1345.

In the First Remand Determination, the Commission defined residual demand as "the difference between demand . . . and production plus available inventories."[6]  First Remand Determination, at *3.  The Commission rejected Plaintiff-Intervenor Louis Dreyfus' proposed method for treating the unused stock in inventory as a "cushion" left untouched by the domestic industry, which the Commission found erroneous because the domestic industry views inventory exceeding twenty weeks of supply as a liability.  Id. at *5.  Finding that the domestic industry "needs to have only 12 weeks available at the start of the crop year to carry the processors from October to January," the Commission designated twelve weeks from the beginning-of-period ("BOP") inventory as the amount needed as a reserve and considered any excess inventory as available for sale during the year.  Id. at *5, 7–8.

---

[6]The Commission rejected Plaintiff-Intervenor Louis Dreyfus' proposed definition of available inventories as "'the sum of domestic production for [one] year and the change in domestic inventory levels, whether positive or negative,'" finding that "this analysis understates by a significant amount the volume of domestic juice that is available in any given crop year to satisfy domestic consumption" and "overstates the amount of subject imports necessary to meet the residual demand."  First Remand Determination, at *5 (quoting Tropicana I, 484 F. Supp. 2d at 1344 n.22).

Using these definitions, the Commission calculated the residual demand for each year of the POI by adding the amount of each year's domestic production to the BOP inventory available for sale, then subtracting the domestic consumption during that year.  The results are as follows:

| Crop Year | Domestic Production | BOP Inventory | Assume 12 Weeks Inventory Not Available for Sale | BOP Inventory Available for Sale | Domestic Production Plus Available Inventory | Domestic Consumption | Residual Demand |
|---|---|---|---|---|---|---|---|
| 2001 /02 | 1,432,162 | 698,464 | 333,683 | 364,781 | 1,796,943 | 1,445,959 | -350,984 |
| 2002 /03 | 1,246,761 | 692,163 | 328,260 | 363,903 | 1,610,664 | 1,422,460 | -188,204 |
| 2003 /04 | 1,471,334 | 704,509 | 330,651 | 373,858 | 1,845,192 | 1,432,822 | -412,370 |
| 2004 /05 | 1,006,642 | 842,139 | 345,642 | 496,497 | 1,503,139 | 1,497,781 | -5,358 |

Id. at *7.  Based on these figures, the Commission determined that "the domestic industry had more than adequate inventory to satisfy domestic consumption during the final crop year . . . and more than adequate carryover stocks for the following crop year," and concluded that "there was no residual demand . . . needed to be met by subject imports at any time during the period."  Id.

The court finds that the Commission applied a reasonable methodology for calculating residual demand.  To determine residual demand, the Commission relied on data generated by the Department of Agriculture, which applied a similar methodology to calculate the U.S. production, supply, and distribution of certain orange juice from crop years 1989/90

through 2004/05.[7]  See id. (citing Original Determination, at Table IV-6).  In the Commission's

determination, the BOP inventory figures represent the amount of orange juice unused in one

year and available for use in the next year.  Id.; see also Original Determination, at Table IV-6.

The Commission reasonably considered all sources of end-of-year inventory in calculating the

available supply for the next year, and did not unreasonably refuse to consider any portion of the

inventory, including subject imports, as somehow unavailable for consumption.[8]  Although

subject imports are clearly not part of domestic production, subject imports that were brought

into the U.S. during the crop year and were not completely consumed during that year would

have become part of the domestic industry's inventory, and were therefore reasonably included

in the BOP inventory figure for the following year.

   In addition, the Commission's use of a twelve week reserve is supported by

substantial evidence.  The Commission decided to use a twelve week minimum based on the

testimony of the domestic industry's economist, which stated that the industry needs only twelve

weeks of inventory at the start of the crop year to ensure supply until the harvest of Hamlin

oranges in January, although the industry "prefers" sixteen to twenty weeks.  First Remand

Determination, at *6.  Other witnesses did not rebut this claim.  Id.  Further, although the record

---

[7]The chart begins by looking at the BOP, which is presumably the unused amount of orange juice carried over from the previous year, for the first baseline year of CY 1989/90. Original Determination, at Table IV-6.  The BOP is then added to domestic production and total imports to arrive at the total supply.  Id.  Exports and domestic consumption are subtracted from this amount, and the resulting figure is the ending stock, which is then used as the BOP inventory for the following year.  Id.

[8]Tropicana argued that the Commission should not have included subject imports in the BOP inventory figures, given the premise that domestic products were sufficient to satisfy domestic demand.  (See Pl.'s Objections to Comm'n's Remand Det., at 9, Tropicana II.)

Case 1:06-cv-00109-JAR Document 133 Filed 02/05/08 Page 15 of 22

shows that the domestic industry never allowed BOP inventories to fall below 14.4 weeks of supply during the POI,[9] the record also shows that subject imports exceeded residual demand during the POI, even when assuming that twenty weeks of the BOP inventories were not available for sale.[10]

Accordingly, the court will affirm the Commission's calculation of residual demand as a "reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions." Ceramica Regiomontana, S.A. v. United States, 636 F. Supp. 961, 966 (CIT 1986).

---

[9]The Commission noted that "beginning-of-period inventory levels increased from 14.4 weeks in crop year 2001/02 to 17.7 weeks in 2002/03, then dropped slightly to 16.2 weeks in 2003/04 before rising to 24.9 weeks at the beginning of the last crop year (2004/05) covered by the POI." First Remand Determination, at *6.

[10]The Commission produced the following table calculating residual demand after assuming that twenty weeks of the BOP inventories were not available for sale:

| Crop Year | Domestic Production | BOP Inventory | Assume 20 Weeks Inventory Not Available for Sale | BOP Inventory Available for Sale | Domestic Production Plus Available Inventory | Domestic Consumption | Residual Demand | Subject Imports |
|---|---|---|---|---|---|---|---|---|
| 2001 /02 | 1,432,162 | 698,464 | 556,138 | 142,326 | 1,574,488 | 1,445,959 | -128,529 | 109,728 |
| 2002 /03 | 1,246,761 | 692,163 | 547,100 | 145,063 | 1,391,824 | 1,422,460 | 30,636 | 227,280 |
| 2003 /04 | 1,471,334 | 704,509 | 551,085 | 153,424 | 1,624,758 | 1,432,822 | -191,936 | 154,203 |
| 2004 /05 | 1,006,642 | 842,139 | 576,070 | 266,069 | 1,272,711 | 1,497,781 | 225,070 | 231,711 |

First Remand Determination, at *8 n.42.

Case 1:06-cv-00109-JAR Document 134 Filed 02/05/08 Page 16 of 22

**B. Price Effect of Subject Imports**

In Tropicana I, the court also instructed the Commission to reexamine its finding that subject imports significantly suppressed domestic prices. In particular, the court questioned "why the Commission attributed a cost-price squeeze experienced by the domestic industry to the volume of Brazilian imports entering the U.S. without examining how demand factors, such as the limited increase in domestic consumption of orange juice during the POI, may have prevented the domestic industry from raising prices." Tropicana I, 484 F. Supp. 2d at 1346. In addition, the court instructed the Commission to "consider how the low level of subject imports held in inventory, consisting at the most of 8.7% of the domestic inventories during the POI, and less than 5% in two of the years of the POI, contributed significantly, rather than minimally, to the suppression of domestic prices," id., and to consider the "dissenting Commissioner's conclusion that monthly subject import volumes fluctuated significantly in a manner that did not correlate with fluctuations in prices." Id. at 1346 n.27.

In the First Remand Determination, the Commission addressed the court's concerns and provided a sufficient explanation for its conclusions, finding that demand factors "did not significantly contribute to the price suppression experienced by the domestic producers for two reasons." First Remand Determination, at *10. First, the Commission emphasized that domestic consumption had increased during the POI, which "should have made it easier for domestic producers to pass on higher costs to their customers through higher prices." Id. Second, the Commission stated that "domestic producers should have been capable of increasing their prices without increasing retail orange juice prices and consequently reducing downstream orange juice demand, because the gap between wholesale prices of certain orange juice and retail

orange juice prices increased over the period of investigation." Id. at *11 (citing Original

Determination at *23–24). The Commission found that retailers should therefore have had the

"financial latitude to maintain retail orange juice prices even as domestic producers recovered

their costs through higher certain orange juice prices." Id.

The Commission also cited additional factors, including "the domestic industry's

limited capacity, the limited number of competitors, and the inelasticity of certain orange juice

demand," as further evidence that domestic producers should have been able to raise certain

orange juice prices without affecting retail prices of orange juice. Id. The Commission noted,

however, that "the cost-price squeeze affecting the domestic industry intensified toward the end

of the [POI], as the volume of low-priced subject imports increased more than the increase in

U.S. apparent consumption." Id. The Commission also stated that subject imports undersold the

domestic like product in forty-one out of forty-eight quarterly comparisons. Id. The

Commission therefore concluded that "the increase in the volume of low-priced subject imports

in excess of U.S. apparent consumption growth, in the absence of any residual demand that

needed to be met by subject imports, contributed significantly to the domestic industry's inability

to raise prices commensurate with increasing costs." Id.

The Commission addressed the court's concerns on how the low level of subject

imports held in inventory could affect domestic prices, finding that "even a relatively modest

increase in the volume of subject merchandise would likely have [had] significant

price-suppressing effects in a commodity market like that for certain orange juice." Id. The

Commission reasoned that the accumulation of subject imports in domestic inventory "would

have dampened demand for the domestic like product just as domestic industry costs were

Case 1:06-cv-00109-JAR Document 134-1 Filed 02/05/08 Page 18 of 22

increasing." Id. at *12. The Commission found that "the timing and magnitude of the increase in subject import inventories, coupled with the price sensitivity of the certain orange juice market, contributed significantly to the domestic industry's inability to recoup higher costs through higher prices."[11] Id.

Because the Commission provided sufficient explanation and substantial evidence in support of its finding that demand did not significantly affect the price suppression experienced by domestic producers, the Commission's conclusion is affirmed.

**IV. Domestic Industry's Opposition to the Petition**

Finally, in Tropicana I, the court instructed the Commission to "explain why the opposition of the domestic industry did not cast doubt upon the Commission's findings." Tropicana I, 484 F. Supp. 2d at 1348–49. In the First Remand Determination, the Commission stated that "[t]he level of industry support for the petition is one factor among many," and that "the more important and objective consideration is whether the shipment, financial, market share, and inventory data demonstrate that the domestic industry as a whole suffered material injury by reason of subject imports from Brazil." First Remand Determination, at *14. The Commission stated that it "will not speculate on . . . the motives of certain domestic producers

---

[11]The Commission also noted that "the absence of any inverse correlation between trends in subject import volume and trends in prices for the domestic like product" is insignificant because the Commission found that subject imports suppressed domestic prices, rather than depressed domestic prices. First Remand Determination, at *12. The Commission again emphasized that domestic prices did not increase enough to compensate for higher domestic industry costs and that the ratio of the cost of goods sold to net sales reached its highest level during crop year 2004/05, and found that the inverse correlation between trends in subject import volume and trends in prices for the domestic like product "does not capture the extent to which domestic prices were suppressed or the factors that contributed to price suppression." Id.

Case 1:06-cv-00109-JAR Document 133 Filed 02/05/08 Page 19 of 22

for opposing the petition," but noted that some of the processors opposed to the petition had "corporate ties to companies with financial interests in the production or importation of the Brazilian subject product."[12] Id. at *14–15. The Commission therefore maintained its determination that the domestic orange juice industry was materially injured by reason of subject imports.

The Commission has properly considered the opposition to the petition and sufficiently explained its decision to attribute less weight to the opposition to the petition by processors with ties to Brazilian exporters. "[T]he court's function is not to 'reweigh the evidence or substitute its own judgment for that of the agency.'" Allegheny Ludlum, 475 F. Supp. 2d at 1374 (quoting Usinor v. United States, 342 F. Supp. 2d 1267, 1272 (CIT 2004)). The court therefore affirms the Commission's determination with respect to domestic opposition to the petition.

**CONCLUSION**

For the foregoing reasons, the affirmative remand determination by the Commission is affirmed. The Commission has addressed all of the concerns noted by the court

---

[12]The Commission found that "[[ ]] producers, accounting for [[ ]] percent of domestic production in the final crop year of the period examined, supported the petition," while "[[ ]] producers, accounting for [[ ]] percent of domestic production, opposed the petition." First Remand Determination (Confidential), at *23. [[ ]] of the [[ ]] opposing producers, accounting for approximately [[ ]] percent of domestic production, "have corporate ties to companies with financial interests in the production or importation of the Brazilian subject product." Id.

in Tropicana I and II, and its conclusions are supported by substantial evidence. Judgment is entered for the defendant.

/s/ Jane A. Restani
Jane A. Restani
Chief Judge

Dated this 5th day of February, 2008.
New York, New York.

**UNITED STATES COURT OF INTERNATIONAL TRADE**

TROPICANA PRODUCTS, INC.,

Plaintiff,

and

LOUIS DREYFUS CITRUS, INC., and FISCHER S/A AGROINDUSTRIA,

Plaintiff-Intervenors,

v.

UNITED STATES,

Defendant,

and

A. DUDA & SONS, INC., CITRUS WORLD, INC., FLORIDA CITRUS MUTUAL, SOUTHERN GARDENS CITRUS PROCESSING CORP., and THE COCA-COLA COMPANY,

Defendant-Intervenors.

Before: Jane A. Restani, Chief Judge

Court No. 06-00109

**JUDGMENT**

This case having been submitted for decision and the court, after deliberation, having rendered a decision therein; now, in conformity with that decision,

IT IS HEREBY ORDERED that the affirmative determination of material injury by reason of subject imports is affirmed. Judgment is entered for the Defendant.

/s/ Jane A. Restani
Jane A. Restani
Chief Judge

Dated: This 5th Day of February, 2008.
New York, New York.

## NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: February 5, 2008

By: /s/ Steve Taronji
Deputy Clerk